**In the INTEREST of S.J., A Child.**

**S.S., Natural Mother, Appellant,**

**State of Iowa, Appellee.**

No. 89–459.

Supreme Court of Iowa.

Feb. 21, 1990.

Mary Schumacher of Roth & Schumacher, Dubuque, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Charles K. Phillips, Asst. Atty. Gen., and Jean Becker, Asst. County Atty., for appellee.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, NEUMAN, and ANDREASEN, JJ.

SCHULTZ, Justice.

In this appeal the mother challenges the juvenile court ruling terminating her parental rights with respect to her son, S.J. The legal father voluntarily consented to the termination of his parental rights and is not a party to this appeal. The court of appeals reversed the judgment, holding that there was not clear and convincing evidence to support the termination. We affirm the ruling of the court of appeals.

The mother, S.S., was born in 1959. While growing up, she was an admittedly difficult child who was frequently truant from school; she left home when she was seventeen. S.S. has received psychiatric treatment in the past and continues to seek help. She is presently divorced from the man she married while she was pregnant with S.J. S.J.'s biological father, who has spent time in prison, is also the father of her daughter. S.S. currently resides in Dubuque with her daughter and new husband, whom she met through correspondence while he was in prison for writing bad checks. Both S.S. and her husband are presently unemployed, and she receives ADC, food stamps and medical benefits.

S.J., who was born in 1980, started receiving in-home services at approximately one year of age because of delayed development. He was started on Ritalin when he was three years old as treatment for hyperactivity. In 1986, he was diagnosed by the University of Iowa Hospitals Child Psychiatric Service as suffering from attention deficit disorder with hyperactivity, atypical conduct disorder and borderline intellectual function. The hospital recommended that S.J. be placed in a residential treatment program. At this time S.J. was living at home with his mother and younger sister; his father did not reside with the family. The family was receiving voluntary services from the Department of Human Services (department) which concen-

trated on helping S.S. improve her parenting abilities and skill in caring for S.J.

In May 1987, the department investigated a report that S.J.'s sister had been physically abused. The investigator found that she had received bruises when her mother slapped her twice on each side of her face. In this proceeding the juvenile court found that the bruises had been caused by S.J. After the little girl had been evaluated and S.S. refused to answer questions, the court approved the investigator's request that the children be temporarily removed from their mother's custody. The children were subsequently adjudicated in need of assistance. On June 30, 1987, both of the children were returned to S.S.'s custody with the provisos that she participate in an unannounced homemaker visitation program and in parent development classes and that her daughter attend protective day care two half-days per week.

In November 1987, S.S. reported that she could no longer handle S.J. at home and requested that he be placed in a residential program. Contemporaneous with this request, as the result of a diagnostic education evaluation, S.J. was moved from a behavior disorder classroom at his elementary school serving children who were weighted 2.2 to a 3.6 classroom. A 3.6 weighting indicates the most severely handicapping condition in Iowa. He was also receiving sixty milligrams of Ritalin per day. The department recommended that he be placed in a foster home in Dubuque County as the least restrictive alternative available and requested that his medication level be reduced. S.J. was then placed with a foster family in December 1987.

S.J.'s condition was reassessed at the University of Iowa in February 1988. He was released after a thirty-day evaluation with the diagnosis of attention deficit disorder with hyperactivity, undersocialized aggressive conduct disorder, and functional enuresis. The Child Psychiatric Service recommended that he remain with his current foster mother unless his behavior problems were to increase dramatically. S.J. was then discharged on a much-reduced dose of Ritalin to be taken only on school days. He continued to have weekly visits with his mother. In November 1988, these weekly visits were expanded to one overnight visit per week and more on the holidays.

In February 1989, the State of Iowa filed a petition to terminate the parental rights of S.S. and S.J.'s legal father. The State noted that S.S. had difficulty controlling S.J. and concluded that he could not be returned to his mother's custody without being at risk of neglect due to her failure to "provide him with sufficiently intensive supervision and direction." The State also asserted that there was clear and convincing evidence that the father had abandoned S.J.

At the termination hearing all of the parties stipulated that S.J. had been adjudicated a child in need of assistance pursuant to Iowa Code section 232.96 (1987) and that custody had been transferred from his parents for at least twelve of the last eighteen months. The court noted its concern over the absence of any significant improvement in S.S.'s parenting skills despite the extensive support services that had been provided. This led the court to conclude that there was no reason to believe that she would ever acquire the skills necessary to meet S.J.'s needs. It held that the State had met its burden of proving by clear and convincing evidence that S.J. could not be returned to S.S.'s custody and terminated the parent-child relationship pursuant to Iowa Code section 232.116(1)(e) (1989)[1]. The court also concluded that "it believes the termination to be in the child's best interest."

1. Section 232.116(1)(e) provides that the court may terminate parental rights following a showing that (1) the child has been adjudicated in need of assistance pursuant to Iowa Code section 232.96; (2) the custody of the child has been transferred from the parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months; and (3) there is clear and convincing evidence that the child cannot be returned to parent's custody as provided in Iowa Code section 232.102.

In her appeal, S.S. claims that there was not clear and convincing evidence that it was in S.J.'s best interest to terminate the parent-child relationship. The court of appeals agreed and reversed the termination, finding that there was no valid reason to deprive S.J. of that relationship. The State sought further review.

■■■ In parental termination proceedings the State must prove the allegations of its petition by clear and convincing evidence. *In re J.S.*, 427 N.W.2d 162, 163 (Iowa 1988); *In re B.L.A.* 357 N.W.2d 20, 24 (Iowa 1984); *In re M.H.*, 367 N.W.2d 275, 278 (Iowa App.1985); *see Santosky v. Kramer*, 455 U.S. 745, 769–70, 102 S.Ct. 1388, 1402, 71 L.Ed.2d 599, 617 (1982). Our review of parental termination proceedings is de novo. *In re D.P.*, 431 N.W.2d 777, 780 (Iowa 1988). We give weight to the factfinding of the juvenile court, especially when considering the credibility of witnesses, but we are not bound by it. *Id.;* Iowa R.App.P. 14(f)(7).

Our primary concern is the best interest of the child. *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981). *See also* Iowa Code § 232.116(2) (1989) ("[T]he court shall give primary consideration to the physical, mental, and emotional condition and needs of the child."). There is a rebuttable presumption that the best interest of a child is served when custody is with the natural parents. Iowa Code § 232.1 (1989); *In re Chad*, 318 N.W.2d 213, 218 (Iowa 1982) (citing *Santosky*, 455 U.S. at 753, 102 S.Ct. at 1394–95, 71 L.Ed.2d at 606) ("[F]undamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.").

■■■ Our review of the record demonstrates a major weakness in the State's case. There is a lack of quality evidence on the question of what the future holds for this child; we have no professional guidance as to how S.J. may develop and behave when he is ten, twelve or sixteen years of age. The State's evidence consists solely of testimony by social workers and visiting nurses describing a mother who cannot control her troubled child. There are no professional opinions or evaluations which are probative of S.J.'s prognosis. *See In re I.L.G.R.*, 433 N.W.2d 681, 691–92 (Iowa 1988) (professional opinions offered throughout proceedings that child with behavior problems will continue to need specialized care); *In re A.M.S.*, 419 N.W.2d 723, 727, 730 (Iowa 1988) (psychologist's opinion offered on parent's ability to develop parental skills; child neurologist and pediatrician stated long term prognosis of mentally and physically handicapped child); *In re T.D.C.*, 336 N.W.2d 738, 743 (Iowa 1983) (psychiatrist recommended child have a secure home environment on a permanent basis).

In its decision, the juvenile court relied upon a February 1988 report from the University of Iowa Child Psychiatric Service, but this report dwelled on the short-term, rather than the long-term prognosis, and did not address the merits of terminating parental rights. Without any additional professional guidance, we can only speculate as to S.J.'s future problems and whether he will continue to require special care.

The State's chief witness was the social worker who recommended termination. While he did not discuss his educational background, he testified that he previously had been both a minister and a supervisor of adolescent paper carriers. While we are impressed by his sense of duty, we believe that further evaluations by professionals in the field of children's mental health would be of more assistance in making this difficult decision. We do not suggest that every, or even most terminations require this type of evidence, but we believe that it is preferable in cases involving children with special and difficult mental problems.

Additionally, we believe that it is important to consider the effect of the evidence regarding the disparate abilities of the natural and foster mother to parent S.J. While the juvenile court properly did not turn its decision on this disparity, we believe these circumstances had an underly-

ing impact on the State's decision to seek termination.

■ It is undisputed that S.J. is a child with a severe behavioral disability. Everyone involved with this family, including the Child Psychiatric Service recognizes that his foster mother has done an exceptional job caring for him and helping him try to overcome his disabilities. In evaluating the best interest of a child in a termination proceeding, the superior parenting ability of a foster parent as compared with that of the natural parent is not entitled to great weight unless the foster parent plans to adopt the child. *See In re A.M.S.*, 419 N.W.2d at 732. This is not the case here.

■ While we recognize and commend the exceptional abilities of S.J.'s foster mother, her superior capability is not a legally sufficient reason to terminate the relationship of a natural parent with her child. In *In re Blackledge*, 304 N.W.2d 209, 214–15 (Iowa 1981), we reversed the juvenile court decision which transferred custody to the father, stating:

> Unfortunately the court's decision seems to have been influenced by a comparison of [the mother's] home with the father's.... Presumably every foster home will provide good care. The parent's right to have a child returned, however, is not measured by comparing the parent's home to the foster home or an ideal home. Rather the parent's right is established by negating the risk of reoccurrence of harm.

It is evident that S.J.'s behavior, self-esteem and intelligence have improved since his placement with his foster family. However, as his medication and classroom assignment were also changed, it is not clear how much each alteration contributed to his overall improvement.

In *In re Wardle*, 207 N.W.2d 554 (Iowa 1973), we did not terminate the parent-child relationship between a mentally deficient mother and a child with behavior problems. In that case, as in the present one, there were allegations that the mother did not effectively discipline her child who was voluntarily placed in a foster home. In both cases the child's behavior improved in fos-

ter care. In ordering the return of the child to her mother, we stated:

> There is a probability [that the child] would be placed in a home having certain advantages which she may never experience if left with [her mother].... But, these advantages, regardless of how desirable, cannot serve as a basis for terminating a parent-child relationship even when coupled with [the child's] behavior problem.

*Id.* at 564.

S.S. has acknowledged her inability at this time to care for S.J. adequately at her home. She has fully cooperated with the department plan approved by the court and has exercised all of her visitation rights. It is evident that S.J. looks forward to his visits with his mother, despite the discipline problems that seem to arise when he is there. Even the social worker who recommends termination admits that there is a bond between S.J. and his mother.

The State claims that S.S. has not improved her parenting skills despite the family-centered and parent/skill development services provided through the department. However, at the same time, the State has dismissed its child-in-need-of-assistance action concerning S.J.'s younger sister, as the department is now satisfied with the care that S.S. is able to provide.

The State also claims that S.J. does not receive appropriate and consistent discipline from his mother. It points to her inability to give S.J. time-outs without physically restraining him. However, the family counselor was forced to admit that given S.J.'s refusal to stay where he was placed, S.S.'s response of physically restraining him was the appropriate one. The school social-work supervisor testified that S.J. needs a twelve to one praise:criticism:praise ratio. This means that whenever anyone criticizes his behavior, someone needs to intervene twelve times "finding positive approaches and positive behavior" to let S.J. know that he is capable. Certainly S.S. is attempting an appropriate response when she answers S.J.'s misbehav-

ior and cries of "I hate you" with "Well, I love you."

The State cites the danger that S.J.'s aggressive behavior poses to his younger sister. While S.J.'s behavior problems are severe, we note that the reports indicate that he has improved substantially since his placement in foster care and in a new classroom at school. There have been no reports that S.J. has had any problems with the different children also placed with his foster family. At this time we do not suggest that foster care be terminated and S.J. be returned to his mother's home. If and when such a placement is possible, S.J.'s behavior toward his sister must be reevaluated in light of the circumstances at that time.

We do not dismiss the termination request lightly. We have carefully considered what might happen if termination is granted or denied at this time. S.J., at nine years old, with both a behavioral and learning disability, is not a prime candidate for adoption. While the record is replete with evidence that his foster mother is better able to meet his many needs than is S.S., his foster family will not adopt him. The discharge summary from the February 1988 psychiatric evaluation at the University of Iowa states the following: ·

> We don't consider [S.J.] to be an adoptable child due to his hyperactivity, impulsivity, noncompliance and physical aggression. . . .
>
> . . .
>
> We feel that less experienced parents or foster parents would find it difficult, if not impossible, to effectively manage [S.J.'s] behavior.

The departmental social worker, while stating that he believed a home could be found for S.J., also acknowledged the difficulty of that quest. The social worker's supervisor acknowledged that if S.J. were placed for adoption, it would be difficult to find adoptive parents with the skills required to care for him. This case is unlike the situation the court faced in *In re A.M.S.*, where the child suffered from physical and mental problems and able foster parents expressed a desire to adopt the child. 419 N.W.2d at 732.

Termination is an outcome of last resort. To legally end a relationship with an ineffectual but loving and caring mother, without being reasonably assured of any hope of permanency with an adopted family, is of doubtful advantage to S.J. Three scenarios are possible: (1) Adoptive parents may not be found and S.J. would remain in foster care or residential care without a parent; (2) adoptive parents may be found whose abilities to care for S.J. are far below the present foster mother's and more on par with S.S.'s; or (3) adoptive parents may be found who are better able to care for S.J. than is S.S. We must compare these possibilities with the present situation.

It is undisputed that S.J.'s present needs are met at his current foster home and classroom situation. Predicting what will happen in one or two years, however, is risky even with professional guidance. We note, with caution, the 1988 psychiatric report which predicts that S.J. will begin to have "more difficulties with aggression and non-compliance in [his foster home]" and recommends residential treatment as soon as ·possible to improve his prognosis. While this prediction appears at this time to have been overly pessimistic, we must point out that only a short period of time has elapsed since that recommendation. It is also possible that S.J. could mature and improve to the point where he could be reunited with his natural family. His condition could also remain the same.

While we have indicated that children should not be made to suffer indefinitely in parentless limbo, the child's best interest may dictate to the contrary. *See In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987), *cert. denied*, 485 U.S. 1008, 108 S.Ct. 1474, 99 L.Ed.2d 702 (1988). We have also stated that "[w]e cannot gamble with the children's future." *In re Kester*, 228 N.W.2d 107, 110 (Iowa 1975). While the statement in *Kester* was made in the context of a refusal to allow a parent more time to become responsible, it is just as applicable when the effect of a termination on a

child's future is uncertain. We believe that under this record the child's best interest is not served by a termination.

Assistance has been available to S.J.'s family, and he still cannot be returned home. We, therefore, remand to the juvenile court to issue an order directing placement in long-term foster care pursuant to Iowa Code section 232.104(2)(d)(4) (1989). The court will review this order annually as mandated by section 232.104(6) (1989), or more often if needed, to ascertain "whether the best interest of the child is being served." If, upon review, S.J.'s behavior has deteriorated to the point where his caregivers are experiencing greater difficulty with aggression management and noncompliance, residential treatment can be considered. Even if the court would be forced to implement this more restrictive living situation, it need not terminate his relationship with his mother. On the other hand, we do not rule out further termination proceedings if subsequent events make such a proceeding advisable. Such occurrences may include changes or lack thereof in S.J.'s condition, changes in S.S.'s parenting abilities, or the unavailability of his present foster home.

When we weigh these alternatives at this time, we conclude that there is not clear and convincing evidence to support the termination. While this case involves a close question, we do not believe that S.J.'s best interest will be served by the termination of his relationship with a mother whom he loves and who is willing to provide whatever support she can.

In summary, we affirm the court of appeals' dismissal of the termination action.

DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.