**In the Interest of J.W.D., A Child.**

**A.D., Mother, Appellant,**

**State of Iowa, Appellee.**

**89–762.**

Supreme Court of Iowa.

May 23, 1990.

As Corrected Sept. 21, 1990.

Beth H. Trout of Brooks, Ward & Trout, Marshalltown, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Judy Sheirbon, Asst. Atty. Gen., for appellee.

Considered by HARRIS, P.J., and SCHULTZ, CARTER, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

This case involves the parental rights of A.D., mother of J.W.D., a son born on September 8, 1985, when A.D. was sixteen years old. The purported father, R.D., was twenty-eight at the time of the child's birth and has not appealed the trial court's termination of his parental rights. On appeal by the child's mother from the trial court's termination of her parental rights, the court of appeals by a divided vote reversed the decision. We granted the State's application for further review. We now vacate the court of appeals decision and affirm the judgment of the juvenile court.

The mother in this case, A.D., was diagnosed as having a borderline intellectual functioning with a secondary disability of an adjustment reaction with depressed mood. She was attending the special education programs at the Marshalltown, Iowa high school until the birth of her son on September 8, 1985. A.D. and her husband R.D. began receiving therapy services to learn basic parenting and homemaking skills as early as November 1, 1985. The services were terminated when the couple separated in December 1985 due to missed appointments and lack of motivation by the parents.

J.W.D. was adjudicated a child in need of assistance on January 7, 1986. Various parenting services were ordered for A.D. to assist her in caring for J.W.D. while they lived with A.D.'s mother. The department of human services (DHS) workers noted at the beginning of their involvement that A.D. had difficulty meeting her own needs. They stated that A.D. was not always able to understand the responsibility for caring for J.W.D. and relied on her mother's supervision. A.D. would quit caring for J.W.D. when her mother was present.

When A.D. and J.W.D. moved into a small one-bedroom efficiency apartment the DHS worker noted that A.D. was inattentive to situations dangerous to J.W.D., had bad personal hygiene and was not keeping a clean home. A.D. continued to be uncooperative regarding the parenting skills services offered and often claimed that J.W.D. was ill to avoid taking him to protective day care.

In June 1986 a finding was made that J.W.D. was being denied critical care. It was further determined by the DHS worker that A.D. had failed to provide adequate shelter due to the numerous unsanitary conditions and was guilty of physical abuse of J.W.D. A.D. voluntarily placed J.W.D. in foster care and checked herself into a mental health center where she remained until August 10, 1986.

A September 1986 rehearing order transferred custody of J.W.D. to the DHS and required that he remain in foster care. The court listed five goals for A.D. to com-

plete including pursuit of her G.E.D., cooperation with the caseworker, securing work at Mid–Iowa Workshops, maintaining a relationship with her son through visitation and obtaining a safe and stimulating environment for J.W.D.

A.D. proceeded to live in at least seven different residences, did not attend parenting classes, dropped out of school, lost her job at Mid–Iowa and the Iowa Veterans Home and missed many visitations.

In April 1987 A.D. joined the Job Corps program in Denison, Iowa. She visited J.W.D. when home on weekends at her mother's home although J.W.D. remained in foster care. A.D. had telephone contact with J.W.D. at least once a month and wrote him letters once or twice a month while she was in the Job Corps.

While attending the Job Corps A.D. made improvement in the area of personal hygiene and completed a baking and driver's education course, but quit the program in April 1988 before completing a culinary arts program. Although A.D. testified she quit the program to be near J.W.D. she immediately moved to Nevada, Iowa with friends, failing to tell her caseworker where she was living. She had received a check for $900 from the Job Corps. She cashed the $900 check and spent $600 in rent for three months, bought a waterbed for $200 and spent the remainder on clothing for herself and J.W.D. She remained in Nevada for one month but was kicked out of the apartment by her former friends and left the waterbed and some of her clothing behind.

A.D. then moved back to Marshalltown and proceeded to live in six different locations. A.D. admitted that at times she was living with people who were not suitable caretakers for J.W.D. because their own children had been removed from their care. During this period A.D. began and lost two jobs which were unrelated to her training at the Job Corps program. She attended only eleven of thirty-five days while again employed at Mid–Iowa.

After A.D. left the Job Corps program at Denison, Iowa the foster mother observed increasing behavioral problems with J.W.D.

J.W.D. was tested and evaluated at the University of Iowa Hospitals and Clinics in November 1988 and by area education agency (AEA) professionals. He was diagnosed as having a low-average intellectual functioning with mild oppositional disorder. J.W.D. began attending a handicap preschool class four days a week where he exhibited violent behavior. A.D. was unable to control J.W.D.'s behavior and on at least two occasions returned him to the foster mother early from scheduled visitations.

All visitations during this period were held on the premises of girlfriends with whom A.D. was living. A.D. had four visits with J.W.D. in June 1988, and three visits including one overnight visit in July 1988. J.W.D. had four weekend visits totaling seven and one-half days with A.D. in August 1988 and ten days and nights with A.D. in September 1988. A.D. had no visitation for two weeks straight in September for medical reasons. Despite the extent of this visitation the DHS caseworker testified that A.D. did not have prolonged visits during the summer and that it was necessary to have a visitation contract because A.D. failed to set up visits.

At the end of September A.D. entered into a contract with her DHS caseworker to provide for increasingly-longer visitation periods over a four-month period. A.D. successfully completed the first three contracted visitation periods of four days, four days, and eight days.

When J.W.D. arrived for the fourth visit A.D. noticed suspicious marks on J.W.D. and reported this to the DHS. The child abuse investigator completed an investigation interviewing A.D., A.D.'s roommate, and the foster home mother while the visitation continued over a six-day period and concluded that child abuse had occurred, naming A.D. as the perpetrator.

On November 2, 1988, a second child abuse report was filed based on the same visit. The investigator concluded that it could not be determined who was the perpetrator of the abuse reported a second time. Because of the two abuse reports the visitation schedule under the contract

was discontinued and visitation was limited to one time weekly from Thursday afternoon when J.W.D. completed school until Friday noon when he went to school again.

Beginning in September 1988 arrangements were made for A.D. to meet with a psychologist to learn to handle J.W.D.'s inappropriate behavior. A.D. took part in three of nine scheduled appointments. The psychologist did not believe that A.D. could provide the stability J.W.D. needs but did relate that the only time he saw A.D. angry with J.W.D. she successfully followed his model in handling the situation. Also beginning in September 1989 A.D., J.W.D. and a preschool home intervention teacher from the AEA met twelve times. The primary focus of those meetings was the child. Most of the meetings were held in the homes of A.D.'s roommates who were present but were not helpful. The two meetings held in A.D.'s own apartment were the best meetings held. Learning activities were left by the teacher each week until three activities which had been left at the roommates' houses were not returned.

During the period leading up to the termination hearing, J.W.D. became much more manageable. The improvement in behavior was accredited to the AEA daycare program and the foster parents' cooperation with the program rather than A.D.'s involvement.

The termination petition was filed November 23, 1988. The hearing was not held until March 20, 24 and 29, 1989 because A.D. gave birth to a second child which led to the granting of continuances. The birth of this child also led to infrequent visitations while A.D. adjusted to the new responsibilities and recovered from the childbirth.

A.D. moved into an apartment located above her aunt's home at the end of January 1989. The aunt maintains daily contact with A.D. She testified that on occasion she has had to tell A.D. to clean the apartment and admitted A.D. still needs guidance in her day-to-day living. The aunt also expressed an opinion J.W.D. requires more attention from A.D. than the new baby and that A.D. still needs help to deal with both children if the court granted her permanent custody of J.W.D.

■ The State alleged that the parent-child relationship existing between J.W.D. and A.D. should be terminated pursuant to Iowa Code section 232.116(1)(e) (1987). To be successful the State must show by clear and convincing evidence the following three factors:

A. The child has been adjudicated a child in need of assistance pursuant to section Iowa Code section 232.96.

B. The custody of the child has been transferred from the child's parents for placement pursuant to Iowa Code section 232.102, for at least twelve of the eighteen months.

C. There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102, Code of Iowa.

The juvenile court held that two of these factors had been established as shown by the summary of the child in need of assistance proceedings. The issue before the court regarded whether a reunification of the child and parent was possible and in the best interests of the child.

■ The State as parens patriae has the duty to see that every child within its borders receives proper care and treatment. *In the Interest of McDonald*, 201 N.W.2d 447 (Iowa 1972). This would include at the minimum proper food, clothing, discipline and supervision. Every child deserves a safe, healthy and stimulating environment in which to grow and mature.

■ In considering the termination of parental rights the court is to give primary consideration to the physical, mental and emotional condition and needs of the child. Iowa Code § 232.116(2). The court is to determine the long-range as well as the immediate interests of the child. *In the Interest of McGlasson*, 195 N.W.2d 116 (Iowa 1972); *Long v. Long*, 255 N.W.2d 140 (Iowa 1977). Insight for a determination of what the future likely holds for a child if returned to his or her parent can be gained

from evidence of a parent's past performance. *In the Interest of M.H.,* 367 N.W.2d 275 (Iowa App.1985); *In the Interest of C.W.,* 342 N.W.2d 885 (Iowa App.1983).

■ We have in the past stated "mental disability, standing alone is not a sufficient reason for the termination of the parent-child relationship, but it is a contributing factor to the inability to perform the duties of a parent." *In the Interest of Wardle,* 207 N.W.2d 554. Thus, mental disability is a proper factor to consider in determining whether a child is neglected to the point where his or her interest and welfare require termination. *In the Interest of A.M.S.,* 419 N.W.2d 723 (Iowa 1988). In *A.M.S.* the court stated that termination was appropriate when the disabled parent lacks the capacity to meet the child's present needs as well as the capacity to adapt to the child's future needs. Iowa Code section 232.116(2)(a) states that in considering a termination of parental rights such consideration may include whether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition.

The juvenile court concluded that the State had established by clear and convincing evidence that the child, J.W.D., cannot be returned to or placed in the custody of the child's mother, A.D., without the child suffering some harm as set forth in Iowa Code section 232.2(6). The juvenile court was specifically concerned with the harm set forth in sections 232.2(6)(c)(2) and subsection (f). The former subsection states that a child is imminently likely to suffer harmful affects as a result of the failure of the child's parent to exercise a reasonable degree of care in supervising the child. Subsection (f) provides that a child is in need of assistance who is in need of treatment to care or alleviate serious mental illness or disorder or emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior toward self or others and whose parent, guardian or custodian is unwilling or unable to provide such treatment.

■ In undertaking our further review we review the actions of the juvenile court de novo. Iowa R.App.P. 4. We give weight to the findings of the juvenile court, but are not bound by them. Iowa R. App. P. 14(f)(7). Our primary concern is always to determine what is in the best interest of the child. *In the Interest of Chad,* 318 N.W.2d 213, 216 (Iowa 1982). The fact findings of the juvenile court are accorded weight especially when considering the credibility of witnesses that the court has heard and observed. *In the Interest of R.M.,* 431 N.W.2d 196, 199 (Iowa App.1988).

■ In our review we note the juvenile court's careful consideration of the factors involved. The court was not unmindful or unmoved by the efforts made by A.D. which showed a loving interest for J.W.D. There is nothing in the record to show that A.D. does not love her son. At the same time, she is ill equipped to provide the special care that J.W.D. requires.

In reaching this conclusion we look at the history of A.D. in relation to the present problems. A.D. dropped out of high school upon becoming pregnant. She was unable to complete some subject areas in the Job Corps. Although given the opportunity and experiencing some success through the Job Corps she was unable to put her skills to use for employment. She did not apply herself while at Mid–Iowa workshops, with the AEA school psychologist or with the home intervention teacher. The past history indicates that A.D. will not be able to address the problems that will arise now and in the future with a child that has the special needs of J.W.D.

J.W.D. is of low-average intellectual functioning. He is behind developmentally. It is apparent from the record that he does respond appropriately to a highly-structured environment and to positive parenting strategies. For J.W.D. to function effectively he will need parents with exceptional parental skills who are able to give him the special love, support, supervision, patience, and discipline necessary for him to overcome his present disabilities. It is not enough for this child to be provided with adequate food, clothing and shelter.

Unfortunately A.D. is not able to apply herself to the task of meeting J.W.D.'s present needs. We also conclude that she is not able to adapt to J.W.D.'s future needs. The school psychologist from the AEA stated that the prognosis for a normal life for J.W.D. is good if he continues to receive adequate structure and direction as he is now receiving in the present foster home placement. The psychologist concluded, however, that the prognosis for a normal life for J.W.D. is poor if he was returned to the custody of his mother at this time. In fact, the school psychologist saw a potential for J.W.D.'s problems to get worse if custody was given to A.D. We consider the situation here to be different from that presented in *In the Interest of S.J.*, 451 N.W.2d 827 (Iowa 1990), where we found little guidance in the record as to what the future held for the child.

In determining that the parent-child relationship between A.D. and J.W.D. should be terminated, we have considered that this would also separate siblings in that A.D. has recently given birth to another son. We have before stated that siblings should not be separated without good and compelling reasons. We note, however, that J.W.D. and the newborn son of A.D. have never lived together. Consequently, there is no strong attachment between them.

From our de novo review we derive a feeling of sadness, as did the juvenile referee, that A.D. cannot adequately care for J.W.D. The circumstances of her being unable to provide for the needs of J.W.D. may be beyond her control but those needs must nevertheless be met.

We conclude and therefore order that pursuant to Iowa Code section 232.117(3), the parental rights of A.D. with regard to J.W.D. are terminated.

DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT AFFIRMED.