In the Interest of T.C., Minor Child, W.C. and R.C., Parents, Appellants.

No. 93–1713.

Court of Appeals of Iowa.

June 28, 1994.

Kirk A. Daily of Webber, Gaumer, Emanu-
el & Daily, P.C., Ottumwa, for appellants.

Bonnie J. Campbell, Atty. Gen., John M.
Parmeter, Sp. Asst. Atty. Gen., Charles K.
Phillips, Asst. Atty. Gen., and R.T. Starkey,
Asst. County Atty., for appellee-State.

Michelle Swanstrom, Ottumwa, guardian
ad litem for minor child.

Heard by SACKETT, P.J., and CADY and
HUITINK, JJ.

CADY, Judge.

William and Rebecca appeal from the termination of their parental rights to their daughter, Tissia. They claim the State failed to make reasonable efforts for reunification. They also contend the court should have placed Tissia in long-term foster care since they claim adoption in this case may be unlikely. We affirm.

## I. Background Facts and Proceedings

Tissia was born to William and Rebecca on August 28, 1989. She was born with broncho-pulmonary dysplasia and requires a ventilator to breathe. Tissia weighed one pound and eight ounces at birth. She suffers from severe lung scarring and has a tracheotomy to further assist her breathing. In addition, Tissia is severely developmentally delayed.

In March, 1990, Tissia was adjudicated a child in need of assistance, "CINA", pursuant to Iowa Code section 232.2(6)(e) (1993). The parents admitted they were unable to provide the necessary medical treatment for Tissia. Tissia lived in the hospital from her birth until she was placed in foster care in March 1992. Her second and current foster mother is a registered nurse and receives nursing care assistance.

At a May 1993 review hearing, the district court found the parents lacked the ability, training and motivation to care for Tissia, and ordered the State to file a termination petition. At the October 1993 termination hearing, the district court found the parents had been provided all possible services, had not cooperated with training to meet Tissia's medical needs, had not provided a home environment sufficiently clean and sterile to prevent illness or disease and had visited Tissia only twice since the May review hearing. The parents' rights to Tissia were terminated pursuant to Iowa Code section 232.116(1)(e) (1993).

The parents appeal.

■ Appellate review of termination proceedings is de novo. *In re W.G.*, 349 N.W.2d 487, 491 (Iowa 1984) *cert. denied sub nom. J.G. v. Tauke*, 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985). We give weight to the findings of fact of the juvenile court,

especially when considering the credibility of witnesses, but we are not bound by those determinations. *Id.* at 491–92.

## II.  Reasonable Efforts for Reunification

■ William and Rebecca contend the State failed to make reasonable efforts to reunite Tissia with them. Specifically, they contend the State failed to provide them with adequate training and support to attend to Tissia's medical needs.

■ Reasonable efforts to reunite the parent and child are required prior to termination. *In re C.L.H.*, 500 N.W.2d 449, 453 (Iowa App.1993). However, the primary concern in termination proceedings is the best interest of the child. Iowa R.App.P. 14(f)(15); *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

> We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child.

*In re R.M.*, 431 N.W.2d 196, 199 (Iowa App. 1988) (citing *Dameron*, 306 N.W.2d at 745).

■ The State has a duty to see that every child within its borders receives proper care and treatment and must intercede when a parent fails to provide it. *In re I.L.G.R.*, 433 N.W.2d 681, 689 (Iowa 1988). The State must act to prevent probable harm to the child and need not delay until actual physical harm has occurred. *See Dameron*, 306 N.W.2d at 745.

■ Although a parental interest in the integrity of the family unit exists, that interest is not absolute. *Id.* Children deserve a safe, healthy, and stimulating environment in which to grow and mature. *In re J.W.D.*, 456 N.W.2d 214, 217 (Iowa 1990). Once the statutory limit of twelve months of out-of-home placement has been reached, the case

must be viewed with a sense of urgency. *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990).

We find no support in the record for the parents' claims. Tissia was four years old at the time of the termination hearing. She has yet to reside with her parents. She remains severely developmentally delayed but is able to use sign language to communicate some of her needs. She is able to walk with the assistance of a walker. Tissia is also now able to drink through her mouth but is fed through a gastronomy tube three times a day. Each gastronomy feeding takes approximately twenty minutes. In addition, Tissia is currently learning to eat pureed baby food orally. Each oral feeding must be preceded by twenty minutes of oral stimulation. Each oral feeding takes approximately forty-five minutes. Two oral feedings are required daily; four to five oral feedings are ideal. Her caloric need has increased such that she is now being fed three cans of a nutritional supplement through a pump while she sleeps.

Tissia's care requirements also include daily cleansing of the surgical openings in her neck and abdomen, cleaning and changing her equipment several times weekly, and monitoring her equipment and supplies. Tissia also receives routine physical therapy, daily oral and tactile stimulation and speech therapy. She also attends numerous doctor appointments as needed.

Although Tissia's health status has greatly improved, she continues to be at high risk for life-threatening illnesses. Common childhood ailments place her at high risk and require immediate medical intervention. In addition, Tissia requires constant ongoing supervision to safeguard her health and well being.

William and Rebecca have not demonstrated the ability to care for Tissia, in spite of the training provided for them. For example, a detailed plan to return Tissia to their home was established in 1991. A number of meetings were scheduled, which were to be followed by a seven day trial period during which the parents were to care for Tissia in the hospital. The parents missed the first meeting and the plan fell through. The parents failed to attend numerous meetings and

scheduled visits, failed to contact DHS to schedule training, and failed to maintain contact with Tissia's care providers. By the time of the termination hearing, William had not seen Tissia in four months and Rebecca had not seen her in five months. Neither parent was able to apply any previous training to their subsequent care of Tissia. William was not cooperative with the medical staff and attempted to readjust Tissia's ventilator against medical advice. Rebecca continually failed to wash her hands prior to caring for Tissia, which exposed her to the risk of a staph infection. She failed to notice when Tissia's ventilator became disengaged. She remains unable to put the necessary braces on Tissia's feet. Several service providers indicated the family home was not sanitary enough to properly care for Tissia. The parents do not have a telephone or reliable transportation, making it difficult to care for Tissia in an emergency situation.

Shortly after Tissia was adjudicated CINA, the court ordered the parents to undergo psychological evaluations. The testing revealed William was of borderline intelligence, was impulsive and rebellious, had a history of alcohol abuse and problems with the law. The testing also indicated William was uncooperative and probably unable in ability to cooperate with medical treatment for Tissia. Rebecca was assessed to have borderline intellectual functioning, was suggestible and deferred to the father's judgment. The results of the testing also support the juvenile court's finding the parents were unable to care for Tissia's needs.

We find the parents were provided adequate reunification efforts and specialized training services. However, they were unable to gain the skills necessary to care for Tissia. We affirm the juvenile court.

## III. Adoptability

William and Rebecca also claim Tissia is not adoptable and should be placed in long-term foster care. They claim they should be allowed ongoing contact with her.

William and Rebecca's parental rights were terminated pursuant to Iowa Code section 232.116(1)(e) (1991), which permits the juvenile court to terminate the parent-child relationship if the court finds all of the following have occurred:

(1) The child is four years of age or older.

(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

(3) The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

This provision does not, nor does any termination provision, require the State or the juvenile court to make a finding that the child is adoptable in order to terminate parental rights. Our governing consideration is the best interest of the child. We are not prepared to say that it is within the best interests of the child to refuse to terminate parental rights merely because DHS has not made a showing that adoption arrangements have been made. We will not refuse to terminate the rights of parents who would otherwise be terminated because an adoptive home has not been secured. Finally, in contrast to the parents' argument, we note significant evidence in the record indicating Tissia may be adoptable. We find no merit in the parents' argument and affirm the termination of parental rights.

**AFFIRMED.**

HUITINK, J., concurs.

SACKETT, P.J., dissents.

SACKETT, Judge (dissenting).

I dissent.

The focal issue in this case is whether parental rights of parents with borderline intelligence and limited financial resources should be terminated to a child with a serious disability that requires constant specialized care. The child spent two and one-half years in the hospital and since that time has lived

in two foster homes. In both homes, the foster mother was an R.N. with special education in helping the child and, in both homes, the foster parent care was supplemented with specialized nursing care. As the State advances, the child has never been cared for by anyone other than nurses and there are episodes where some of the nurses providing the care have had to be supervised. The bottom line is there are few families with the medical expertise to supply this child's needs.

The parents say the child should be placed in long-term foster care and their rights should not be terminated because the child is not adoptable.

In *In re S.J.*, 451 N.W.2d 827, 832 (1990), the court said "termination" is an outcome of last resort. To legally end a relationship with an ineffectual but loving and caring mother, without being assured of any hope of permanency with an adoptive family, is of doubtful advantage to S.J.

This child's best interest would be to place her in a home with two caring, intelligent parents both who have medical training and who would be willing to devote the time to her that she requires. The problem is that I cannot find under this record that opportunity will be available to this child. Rather, the choices we have are should the child be put in permanent foster care with her biological ties intact or should her parents' parental rights be terminated although there is a strong probability the child will remain in foster care and not be adopted.

Her parents love her and, although they are limited in intelligence, education, and money, they have made an effort and have maintained contact with her. She has siblings. Her family has been the only constant in her life. Social workers, medical personnel, and foster mothers have changed.

The majority states, "we note significant evidence in the record indicating Tissia may be adoptable." The evidence I find about the possibility of her adoption and the only evidence of her adoptability advanced by the State is the following evidence:

Q. Has there been any groundwork done by you or the Department as to determine whether or not the child, with this extensive of medical needs, is likely to be adopted? A. Yes. I've talked with our adoption worker, Bev Ver Steegh, on a staffing on 10/93, and she indicated to me that she has completed *some* adoptions on children with complex medical needs and that she has *a number* of families that would be interested in *looking* at T. as a *possible adoptive situation.* She does not believe that it would be difficult at all to place T. for adoption. (Emphasis supplied).

I am not ready to find, as did the majority, this is significant evidence. First, it is hearsay. Secondly, we are given no actual numbers of adoptions of children with complex needs; we are given no actual number of families who would look at her for possible adoption. Thirdly, there is no evidence of what type of families would look at the child. Fourthly, there is no evidence of the number of other children in state care who are not adopted. I have fear there is a significant number. Fifth, this child's significant problems tell me it would take extremely dedicated adoptive parents. She needs twenty-four hour-a-day nursing care. She was four and one-half at the time of the hearing but her developmental age was twelve to eighteen months. She has significant brain disease, secondary to her lung disease with poor oxygenation. She has a gastrostomy feed tube, a tracheostomy breathing tube and her body cannot regulate its own temperature and it must be artificially maintained.

If the child is going to spend her minority in foster homes and/or institutions, even if her parents' parental rights are terminated, then I find no reason to legally terminate her legal ties to both her parents and siblings.

There is no evidence these parents will be a danger to the child if she is in foster or institutional care. The evidence that forms the basis for this proceeding is that the parents lack the education and ability to care for this child in their home.