**IN THE COURT OF APPEALS OF IOWA**

No. 14-2083
Filed February 11, 2015

**IN THE INTEREST OF D.M. and P.C.,**
 **Minor Children,**

**A.C., Mother,**
 Appellant.

_____

Appeal from the Iowa District Court for Polk County, Joseph W. Seidlin, District Associate Judge.

A mother appeals the termination of her parental rights to her two daughters. **AFFIRMED.**

Patrick W. O'Bryan of O'Bryan Law Firm, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, John P. Sarcone, County Attorney, and Amanda Johnson, Assistant County Attorney, for appellee.

Laura Lockwood of Lockwood Law Firm, P.L.L.C., Des Moines, for father.

Paul White, Des Moines, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, J.**

This case involves the termination of the parental relationship between a mother and her two daughters, D.M. and P.C., both of whom have a rare and potentially fatal genetic disorder. The mother argues on appeal that were it not for the children's special needs, the court would not have been involved with the family and nothing in the record proves she is incapable of caring for the children. Because attending to the children's strict medication and dietary needs is critical to their survival and healthy development, and the professionals who worked with this family did not have faith the mother could do so, we affirm the juvenile court order.

I.      **Background Facts and Proceedings**

D.M. is four and P.C. is one year old. Both girls have been diagnosed with Tyrosinemia type 1, an inherited disorder marked by the lack of ability to breakdown the amino acid tyrosine. "As a result of this deficiency, toxic substances build up in the blood and can cause liver failure, kidney disfunction, and neurological problems." According to Maria Victoria Dajud, a pediatrician at Blank Children's Hospital in Des Moines, "diet and special protein replacements remain an important part of life-long treatment." Doctors have prescribed the drug Orfadin, for D.M. and P.C., which they must drink as a protein-replacement formula throughout each day in regimented doses. When asked what the consequences could be if the children did not drink the formula, home health nurse Carol Shannon testified: "Death." She explained less dramatic

consequences included neurological crises, emotional instability, and developmental delays.

In addition to the prescription formula, the children's metabolic disorder requires them to follow a special low-protein diet. Cheryl Stimson, a registered dietician at the University Hospitals metabolic clinic, testified it was important for parents to keep a food record indicating what their child eats, which needs to be measured out to the half cup or fourth cup so they can stay within the recommended amount of protein for the entire day.

The mother is correct that her family first came to the attention of the Iowa Department of Human Services (DHS) because of D.M.'s medical condition.[1] In July 2012, D.M. was hospitalized for dehydration and the hospital staff determined the parents had not been giving her the prescribed formula. The parents had failed to follow up with the child's blood tests and cancelled appointment with the Visiting Nurse Services. A visiting nurse had recorded D.M.'s weight as 25.2 pounds on June 26, 2012 and by the time D.M. checked into the hospital on July 10, 2012, she weighed only 22.2 pounds—a ten percent

---

[1] The family lived in Tennessee before moving to Iowa. Tennessee records indicate the mother lost custody of her older son in 2009 due to concerns he was being exposed to domestic violence, but the mother testified she "gave [her] guardianship" of the child to her sister. That child is not involved in these proceedings. As for D.M., her condition was diagnosed at Vanderbilt University in June 2011 when she was eight months old. Tennessee authorities removed D.M. from her parents' care in March 2012 because they were not providing her proper medical treatment. In April 2012, a Tennessee court placed custody of D.M. with her father and allowed him to move to Iowa.

drop.  While D.M. was hospitalized, her father[2] physically assaulted the mother in front of the hospital staff.

On July 17, 2012, the juvenile court removed D.M. from the mother's care and placed her in the custody of DHS as the family "fail[ed] to meet the child's medical needs."  The court adjudicated D.M. as a child in need of assistance (CINA) pursuant to Iowa Code sections 232.2(6)(b), 232.2(6)(c)(2), 232.2(6)(e), and 232.2(6)(n) (2011) on August 16, 2012.

On September 18, 2012, the court adopted a case permanency plan that required the mother to undergo a complete psychological evaluation at University Hospitals as soon as possible and to adhere to recommendations for mental health treatment.  The court was concerned about reports from Tennessee concerning the mother's unresolved mental health issues.

On April 9, 2013, the State filed a petition to terminate the parents' legal relationship with D.M.  On November 14, 2013, the juvenile court denied the State's petition and granted a six-month extension for the family to work toward reunification.  Despite the additional time the mother received, she failed to cooperate with the DHS workers and declined to take advantage of the services provided to her.

In January 2014, the mother gave birth to P.C.  The child was diagnosed with the same genetic disorder as her older sister, which the mother had a history of not managing properly.  The juvenile court ordered P.C.'s removal in February

---

[2] The father voluntarily consented to the termination of his parental rights and is not a party to this appeal.

2014, finding it was contrary to her welfare to stay with the mother.[3] The court adjudicated P.C. as a CINA on March 14, 2014.

It was not until this point in the case, March 2014, that the mother underwent the psychological evaluation ordered by the court eighteen months earlier. In the evaluation, the mother acknowledged prior diagnoses of depression and anxiety. The mother did not make the results of the exam available to DHS until two weeks before the termination hearing.

The mother attended visitations for the children, but would often clash with the FSRP (family safety, risk and permanency) workers. The workers noticed D.M. picked up on her mother's hostility, acting scared, and being aggressive with her baby sister P.C. The mother did not show a healthy bond with D.M. and did not insist the child drink her prescribed formula. In fact, on two occasions the mother dumped out the formula so it would appear to the nurse the child had received the appropriate dosage. The mother interacted better with P.C., but had a hard time managing both children at the same time.

On October 1, 2014, the State filed a new petition to terminate the parental rights of the mother and the father as to both D.M. and P.C. The court held a hearing on November 14 and 17, 2014. The State presented the testimony of DHS workers, FSRP staff, a visiting nurse, a nurse practitioner, and

---

[3] Because D.M.'s father, R.M., had been abusive to the mother, a protective order required they have no contact. The mother maintains R.M. is not P.C.'s father. But pediatric nurse practitioner Judy Miller testified Tyrosinemia type 1 is an autosomal recessive condition, meaning for the child to have it, both parents must be carriers of one copy of a non-working gene. The condition is not common, occurring in only about one in 120,000 births.

a dietician. The mother testified on her own behalf, telling the court she did not believe her personal life would affect the children's well-being.

On December 8, 2014, the juvenile court issued an order terminating the mother's parental rights under Iowa Code sections 232.116(1)(d), (f), (i), and (h) (2013). The mother now appeals.

## II.      Standard of Review

We review termination proceedings de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). The State must prove the grounds for termination by clear and convincing evidence. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Evidence is "clear and convincing" when there are no serious or substantial doubts as to the correctness of the conclusions of law drawn from the evidence. *See In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000).

## III.      Analysis of Mother's Claims

In her petition on appeal, the mother contends the juvenile court erred in finding clear and convincing evidence her parental rights should be terminated. Although the juvenile court relied on three statutory bases for the termination of rights as to each child, the mother's petition cites only to Iowa Code section 232.116(1)(d) in support of her argument. She does not challenge Iowa Code sections 232.116(1)(f) (as to D.M), (i), or (h) (as to P.C.).

The State claims the mother did not preserve error because she does not mention the specific deficiencies in the State's proof and fails to cite authority in support of her position. We agree the mother's appellate argument does not adequately address all of the grounds for termination. *See* Iowa R. App. P.

6.903(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."). But even if we were to reach the merits of the general argument advanced by the mother, we would affirm the juvenile court's order.

The juvenile court terminated the mother's relationship with D.M. and P.C. based on paragraphs (f)[4] and (h)[5] respectively. Both require proof the child "cannot be returned to the custody of the child's parents . . . at the present time." "At the present time" means the time of the termination hearing. *See A.M.*, 843 N.W.2d at 111.

The DHS case worker testified she had not been able to observe the mother's home environment because the mother was living with a friend and was waiting to move into her own apartment. The worker testified stable housing was critical to ensuring the children adhere to their strict medication and diet regime.

---

[4] Iowa Code section 232.116(1)(f) reads:
> The court finds that all of the following have occurred:
>   (1) The child is four years of age or older.
>   (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
>   (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
>   (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

[5] Iowa Code Section 232.116(1)(h) reads:
> The court finds that all of the following have occurred:
> (1) The child is three years of age or younger; (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96; (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days; (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Iowa Code section 232.116(1)(h) (2013).

The mother acknowledged at the hearing she did not yet have suitable housing for the children. She testified she believed she could care for them, but added, "I would suggest that until I secure an apartment, I would think that it would be safe for my children to stay where they are at." The mother asserted she would have her own residence by December 1, 2014 (about two weeks after the termination hearing). But she also testified she had not seen the apartment, did not know the address, nor did she know what condition the apartment was in.

Considering the entire record, we agree with the juvenile court's determination the children could not be returned to the mother's care at the present time. Not only did the mother not have suitable housing lined up, she had not shown enough parenting progress to move beyond supervised visitation. The mother only recently met the case permanency goal of obtaining a psychological evaluation. The diagnosis was "severe, recurrent major depression without psychotic features." The evaluator noted the mother had challenges with "anger, coping, learning [and] practicing proper care for her daughters and their disease, following rules/regulations, finances, lack of employment, parenting."

As the juvenile court explained:

As the above information was not made available to DHS until just eight days prior to the hearing on termination of parental rights, there was no opportunity for communication between DHS and [the mother's] physician assistant and therapist to exchange information and assist in the provision of mental health services which would have been more beneficial to [the mother] in her efforts at reunification. [The mother] testified during the termination hearing that it is her personal right not to provide information, and that she does not have to provide information if she doesn't want to. While she is correct in her statement, her refusal to timely provide

information which would assist in reunification efforts only served to prevent success.

The mother already had one extension of time to work toward reunification. The children should not be forced to postpone further a permanent placement while the mother lines up suitable housing and addresses ongoing concerns about her mental health. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) ("It is simply not in the best interests of the children to continue to keep them in temporary foster homes while the natural parents get their lives together."). Therefore, we affirm the termination of parental rights under subsections (f) and (h).

When the juvenile court terminates parental rights on more than one statutory ground, we need only identify support for one of the cited grounds to affirm. *In re S.R.*, 600 N.W.2d 63, 64 (Iowa 1999). But given the mother's assertions on appeal, we also opt to address subsection (i) as a ground for terminating the relationship between the mother and her daughters.

The mother alleges her rights are being terminated because her children have a rare genetic disease, which if not properly treated can be fatal, and "the professionals assigned to this case felt others could do a better job in taking care of these children than their mother" given her mental health diagnoses. The mother alleges: "Much was made of the fact that the children do not want to drink their milk which contains medicine during visits with [the mother], but overlooked in the criticism is the fact that the children were often fed shortly before these visits and were not hungry." The mother's allegations do not accurately reflect the evidence offered in support of the termination.

In terminating under section 232.116(1)(i),[6] the juvenile court found both children met the definition of CINA based on a finding of neglect through acts or omissions of the parents. *See In re K.M.*, 653 N.W.2d 602, 605 (Iowa 2002) (holding first paragraph of subsection (i) does not require an *adjudication* of abuse or neglect, but instead a finding the child meets the CINA definition). These children have a serious metabolic disorder. Failure to provide them proper medical care and nutrition can result in rapidly deteriorating health— leading to death. As the district court stated D.M. "was heading in that direction when DHS first became involved in 2012." The mother did not cooperate with the visiting nurse concerning the care of D.M. And when P.C. was diagnosed with the same serious medical condition shortly after her birth, the mother did not allow the nurse to see the infant. The district court appropriately decided the children met the CINA definition for neglect.

We also agree with the district court that there is clear and convincing evidence the mother's neglect posed a significant risk to the children's lives and the offer or receipt of services would not correct the conditions that led to the neglect within a reasonable period of time. The mother had not consistently

---

[6] Iowa Code section 232.116(1)(i) reads:
> The court finds that all of the following have occurred:
> (1) The child meets the definition of child in need of assistance based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents.
> (2) There is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child.
> (3) There is clear and convincing evidence that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time.

accepted services to assist her in understanding and properly addressing the children's medical and nutritional needs. Our case law has recognized that neglect can take on a distinct meaning in the case of children with special needs. *See In re J.E.*, 723 N.W.2d 793, 799 (Iowa 2006); *see also In re J.W.D.*, 456 N.W.2d 214, 218–19 (Iowa 1990).

Visiting nurse Carol Shannon, who attended the mother's visitation with the children, testified the mother understands what the disease is, "but does not fully believe or comprehend the impact that it can have on their lives." Shannon recalled the mother saying she would like to have a "normal visit of just playing" with the children. The nurse explained: "There will never be normal visitations because their life depends on a very consistent, very structured adherence to the medical plan." The nurse believed the mother's mental health issues hindered her ability to provide for the children's medical needs and expressed her opinion the mother had not "fully come to grips with how serious this condition is."

Contrary to the mother's allegations, the foster mother testified she offered D.M. less formula in the mornings when the child had supervised visitation in the "hope that would help her succeed at the visit with drinking her milk." The foster mother also testified to the scrupulous effort she went through to be sure the two girls followed their prescribed feeding schedule.

Not only did the mother lack the parenting skills and the will to be sure the children drank the prescribed amount of formula during the visits, the mother showed little promise that she could meet their demanding nutritional needs if they were returned to her care. The mother was unable to prepare a sample

food log to accurately count the amount of protein the children would be consuming when served different foods. The mother also failed to recognize the importance of promptly referring P.C. to occupational therapy to work on her developmental delay in eating solid foods.

Ultimately, we are persuaded by the views of the children's guardian ad litem (GAL), who recommended termination of the mother's parental rights. The GAL aptly observed this was a case "where there really isn't any room for error. As the expert testified, if that strict diet is maintained, the children have a ninety percent survival rate. If it is not, . . . death can occur." Based on his involvement in the case and the evidence presented, the GAL said he did not "have any confidence that the mother is able to taken on that role and maintain that diet." On this record, we find termination was appropriate under section 232.116(1)(i), as well as under sections 232.116(1)(f) and (h).

**AFFIRMED.**