**In the Interest of T.T., T.T., and G.F., Minor Children,**

**S.F., Mother, Appellant,**

**R.T., Father, Appellant.**

**No. 95–754.**

Court of Appeals of Iowa.

Oct. 31, 1995.

---

Roberta M. Anderson of Schroeder & Anderson, Mason City, for appellant S.F.

Charles H. Levad, Mason City, for appellant R.T.

Thomas J. Miller, Attorney General, Diane Stahle, Special Assistant Attorney General, Judy Sheirbon, Assistant Attorney General, and Steven D. Tynan, County Attorney, for appellee.

Considered by HAYDEN, P.J., and HABHAB and HUITINK, JJ.

HAYDEN, Presiding Judge.

S.F. and R.T. are the parents of two minor children, To., born October 25, 1987, and Ta., born October 10, 1988. S.F. and R.T. never married. S.F. has another child, G.F., born August 17, 1991. Either David A. or Charles F. is G.F.'s father. In a March 30, 1995, order, the juvenile court terminated the parental rights of S.F. as to all three children, R.T. as to To. and Ta., and David and Charles as to G.F. Neither David nor Charles appealed the termination of his potential parental rights. Both S.F. and R.T. appeal.

S.F. has been diagnosed as mildly mentally retarded with an IQ of 78 and suffers from depression. She only does well in a highly structured situation and has limited capacity to implement recommendations from the Iowa Department of Human Services (DHS). R.T. has been diagnosed as alcohol and cocaine dependent. R.T. has undergone treatment for his addictions eight times. R.T. was described by therapists as having an antisocial personality. He has been resistant to receiving social services and has little understanding of the special needs of his daughters. Both parents have a history of child abuse.

DHS has been involved with the family since 1988. All three children have been adjudicated children in need of assistance. Ta. was adjudicated on August 23, 1989, To. was adjudicated on May 27, 1992, and G.F. was adjudicated on June 5, 1992. The children currently reside in foster homes. Since January 1993, the girls have not returned to S.F.'s home, and S.F. has had only limited, supervised visitation. The girls are all special needs children. G.F. continues to suffer from severe burns she received when S.F. placed her into a tub of scalding water. She requires lotion therapy three times daily and will required additional extensive surgery, including skin grafts. G.F. has been diagnosed as mildly mentally retarded. Her development is eighteen months behind a child of similar age. G.F. additionally exhibits wild and aggressive behavior. Ta. and To. both suffer from post-traumatic stress disorder. Ta. is mentally retarded and suffers from raw terror of males. Both have suffered verbal abuse.

The State filed a petition to terminate parental rights. The district court concluded the children had so bonded with their respective foster families it would induce a hardship on the children to revert custody back to the parents. The court also noted the children have special needs which S.F. and R.T. are unable to satisfy. Furthermore, little progress was made by either parent toward understanding the special needs of the children. The court consequently entered an order terminating S.F.'s and R.T.'s parental rights to Ta. and To., and also terminated S.F.'s, David A.'s, and Charles F.'s parental rights to G.F. S.F. and R.T. appeal.

S.F. argues termination of her rights was not justified because there was not clear and convincing evidence the children would suffer harm specified in section 232.2(6) if returned to her custody. In support of her argument, S.F. states she has always been willing to accept social services and was making progress toward improving her parenting skills before the State filed its petition. She states, despite her mental disability, she is able to perform the primary functions of

parenting and has made improvements in many of the areas of her life. She notes she has learned to fix meals and plan appropriate activities for the children. She maintains, since the children's needs are not as serious as they were several years ago, she is capable of caring for the children with the help of DHS. Second, S.F. argues the State did not offer her reasonable services to promote reunification. Although she admits many services were offered with which she cooperated, S.F. states she was unable to demonstrate her newly acquired skills because neither unsupervised visits nor visits of several hours were allowed and reunification was never attempted. Lastly, S.F. argues less drastic action than termination of her parental rights would protect the children and preserve the family unit. She believes intensifying services and integrating the children back into her home is a more appropriate course of action.

R.T. contends his case was prejudiced due to the overwhelming evidence supporting termination of S.F.'s parental rights. He argues, although there was clear and convincing evidence indicating S.F.'s parental rights should be terminated, there was not such evidence justifying termination of his parental rights. In support of his argument, R.T. states he has recovered from alcoholism and the children are not fearful of him. R.T. also argues the State failed to offer sufficient services promoting reunification. He claims the State never offered him family services, therapeutic services relative to family integration, or services relative to "special needs" children. Furthermore, he claims the State has not made any trial attempts to return the children to his care despite his compliance with all the State's requirements and his abstinence from alcohol.

## I. Standard of Review.

■ Appellate review of termination proceedings is de novo. *In re W.G.*, 349 N.W.2d 487, 491 (Iowa 1984) *cert. denied sub nom. J.G. v. Tauke*, 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985). We give weight to the findings of fact of the juvenile court, especially when considering the credibility of witnesses, but we are not bound by those determinations. *Id.* at 491–92.

■ The primary concern in termination proceedings is the best interest of the child. Iowa R.App.P. 14(f)(15); *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child.

*In re R.M.*, 431 N.W.2d 196, 199 (Iowa App. 1988) (citing *Dameron*, 306 N.W.2d at 745).

Iowa Code section 232.116(1)(e) (1991) permits the juvenile court to terminate the parent-child relationship if the court finds all of the following have occurred:

(1) The child is four years of age or older.

(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

(3) The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

## II. Termination of S.F.'s Parental Rights.

■ In her first argument, S.F. claims termination of her parental rights is not justified because there is not clear and convincing evidence the children will suffer the harm specified in section 232.2(6). It is the State's burden to show by clear and convincing proof the children will suffer such harm. *In re A.Y.H.*, 483 N.W.2d 820, 822 (Iowa 1992). We find the State has met this burden.

Clear and convincing evidence indicates harm could occur to the children if custody were returned to S.F.

These children have already suffered much abuse which indicates they would not be safe if returned to S.F.'s custody. A parent's past performance may be indicative of the quality of future care the parent is capable of providing. *In re L.L.,* 459 N.W.2d 489, 493–94 (Iowa 1990). DHS has been involved with this family since 1988, and there have been numerous founded child abuse reports regarding these children. Both parents have been listed as perpetrators of the abuse reported. Furthermore, this is not the first time the children have been taken from S.F.'s custody. When the children were returned to S.F. after the first foster home placement, the youngest child, G.F., suffered severe burns at the hands of S.F. and in the presence of the other two girls. S.F. placed G.F. in tub of scalding water burning seventy percent of G.F.'s body. As a result of this abuse, S.F. plead guilty to child endangerment.

Evidence also indicates S.F. is unable to meet the daily needs of the children because of her own limitations and the special needs of the children. All three children have special needs. G.F. is mildly mentally retarded, has an eating disorder, has aggressive behaviors, is sleep impaired, has inappropriate sexual acting out, has anxiety, has post-traumatic stress syndrome, and is developmentally delayed. Because of the burns, G.F. requires special care including lotion therapy three times a day and requires additional surgery. Several medical witnesses testified G.F. requires a "high level" of parenting beyond the level required for a regular child. Witnesses also testified S.F. has been unable to control G.F., minimizes G.F.'s special needs, and has no ability to distinguish between her own wants and G.F.'s needs.

Ta. and To. also have special needs. Ta. suffers from post-traumatic stress disorder, suffers from night terrors, and is mentally retarded. Evidence indicates her behavior regresses when in her mother's home. To. also suffers from post-traumatic stress disorder, night terrors, verbal abuse, and mental retardation. Both Ta. and To. witnessed the incident in which their younger sister was placed in scalding water. Additionally, both Ta. and To. express they do not wish to return to either parent's home.

■ S.F.'s limitations also hinder her ability to care for these children. S.F. is diagnosed as mentally retarded, has an IQ of about 78, and suffers from depression. A parent's mental disability, while not alone sufficient to terminate parental rights, can be a contributing factor to the parent's inability to perform essential parenting functions, and termination can be appropriate where a parent lacks the capacity to meet a child's present and future needs. *In re A.M.S.* 419 N.W.2d 723, 733 (Iowa 1988).

Additionally, S.F. has at times resisted the services offered by DHS. Although she has recently cooperated with services and visits, she makes poor judgments, is inconsistent, and has been ineffective in dealing with the children's behaviors even during supervised visits. She is also easily overwhelmed by caring for the three children. Although she pleaded guilty to child endangerment with regards to the burns she inflicted upon G.F., she fails to understand her role in the burn injuries and minimizes the severity of the burns.

Considering the prior abuse, special needs of the three children, and S.F.'s limitations, it is evident S.F. can not adequately care for these children. This inability to care for the children would likely result in harm if they were returned to her custody. Thus, we determine there is clear and convincing evidence the children will suffer the harm specified in section 232.2(6).

■ In her second argument, S.F. claims the State did not offer reasonable services for reunification. Although S.F. admits many services were offered to her, she believes DHS did not take adequate steps toward reunification. S.F.'s argument concerning DHS's failure to provide services stems primarily from its failure to allow unsupervised visits or visits for several hours. We determine DHS has provided more than adequate services to S.F.

Both S.F. and R.T. received in-home services such as a homemaker and protective

day-care; additionally, they both were offered or received in-home services since the last removal through Lutheran Social Services. S.F. received family therapy until she ended her involvement in March 1992. S.F. received educational and vocational services. Both parents were offered individual mental health counseling which they chose not to utilize as of the termination hearing. Both parents also have received and continue to receive parent skill instruction. It is also important to note, although both parents now object to the fact longer and more frequent visitation was never allowed, there is no evidence either parent requested such visitation. Furthermore, the girls indicated to DHS they did not want to increase visits and wanted the visits supervised.

S.F. notes, since unsupervised overnight visits were allowed during the first foster placement, they should have been allowed again during the second placement before the termination proceeding commenced. The circumstances since the previous visits, however, have changed dramatically. When custody was returned to S.F. after the first placement, S.F. physically abused G.F. by burning seventy percent of her body in scalding water in front of the other two children. DHS is not required to submit the same children to such risks again. Clearly, overnight unsupervised visits could lead to substantial harm to the children.

■ In S.F.'s third argument, she claims less drastic action than termination of parental rights would protect the children and preserve the family unit. In considering whether to terminate, the court must examine if there has been integration within the foster family home, whether the child identifies more with the foster home than the natural parents, whether the situation may become permanent, and whether it is desirable to maintain the environment or continuity. Iowa Code § 232.116(2)(b).

■ We determine termination of S.F.'s parental rights is in the best interest of the children. To continue to keep these children in temporary foster homes is not in their best interests. *In re J.L.P.*, 449 N.W.2d 349, 353 (Iowa 1989). Temporary or even long-term foster care is not in a child's

best interests, especially, as in this case, when the children are adoptable. *In re T.C.*, 522 N.W.2d 106 (Iowa App.1994); *In re M.Z.*, 481 N.W.2d 532 (Iowa App.1991). Children should not suffer the "endless limbo" of foster care. *In re L.S.*, 483 N.W.2d 836, 840 (Iowa 1992). The court must be cognizant of the "relentless passage of time" for children waiting in foster care for parents to gain sufficient skills. *In re A.C.*, 415 N.W.2d 609 (Iowa 1987). Furthermore, when a parent is incapable of changing to allow the child to return home, termination is necessary. *In re M.H.*, 367 N.W.2d 275, 280 (Iowa 1986). A parent must be able to meet the present needs of children, as well as have the capacity to adapt to their future needs. *In re E.B.L.*, 501 N.W.2d 547, 552 (Iowa 1993).

In this case, it is highly unlikely S.F. will ever have the mental or emotional capacity to care for these special needs children. Although S.F. claims she can now fix meals and plan activities for the children, she does not have the capacity to adapt to the children's present or future needs. Furthermore, G.F. has been out of her parents' home two-thirds of her life and has little attachment to her mother. Similarly, To. and Ta. have bonded with their foster parents, have little attachment with their mother, and express no desire to be reunited with S.F. As such, it is in the best interests of the children to terminate S.F.'s parental rights to free the children for adoption.

### III. Termination of R.T.'s Parental Rights.

■ In his first argument, R.T. claims, although there is clear and convincing evidence to terminate S.F.'s parental rights, there is no such evidence justifying termination of his rights. We disagree.

R.T., like S.F., has a history of child abuse. He also has a history of displaying violent behavior. According to mental health providers, R.T. has narcissistic tendencies where he is self-centered and unable to put the needs of others ahead of his own. R.T. has been described by psychologist Ray Little as having "anti-social personality disorder." He is also described as dependent and in need of

someone to care for him. Little believes R.T. has no tolerance for children who react abnormally and placing the children with him would be detrimental to both R.T. and the children.

Furthermore, Ta. resists visits with her father and fears him. Both girls' comments to their counselor indicate they have negative memories of R.T. and have no desire to live with him. A clinical psychologist, Barnes, testified Ta. had no attachment to any male adult. Barnes also testified Ta. has "raw terror" and expectations of violence from males. Another clinical psychologist, Bliss, testified Ta. and To. have virtually no attachment to their father.

■ R.T. also argues DHS failed to provided reasonable services to preserve the family. He states, since the children were taken from his custody, DHS did not offer him family services or therapeutic services relative to family integration. Furthermore, he claims he was never offered services related to "special needs" children. We disagree and determine DHS did provide R.T. with adequate services.

R.T. has a history of being uncooperative with services provided by DHS. As stated in part II, both S.F. and R.T. received in-home services such as homemakers and protective day care. Both were also offered in-home services since the last removal through Lutheran Social Services. Additionally, R.T. has been through approximately eight inpatient substance abuse treatments in the past for his cocaine and alcohol dependencies. Although family therapy services were offered to him, R.T. chose not to accept the services. Mental health counseling was also offered. R.T., however, did not utilize the counseling. R.T. was also never receptive to family therapy. The only service he agreed to accept was the parenting skill instruction. R.T. has been offered numerous services, yet has chosen not to take advantage of them. We determine R.T. was provided with adequate services.

■ The prior abuse perpetrated by R.T., the special needs of the children, and R.T.'s inabilities indicate it is in the best interest of the children for his parental rights to be terminated. We affirm.

### IV. Conclusion.

We determine temporary or even long-term foster care is not in the best interest of the children. We agree with the juvenile court judge when he said, "The parents' past history, lack of capacity and lack of progress coupled with the children's special needs pose a very probable risk of harm." This risk justifies termination. *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992). The children in this case require almost constant supervision, and their caretaker must be able to put the needs of the children first. The record clearly and convincingly reveals neither parent will be able to take on such responsibility. Furthermore, none of the children have bonded to S.F. and R.T. in a parent-child relationship. Both Ta. and To. wish to live with their foster parents and have no desire to return to their natural parents. Foster parents have indicated a willingness to adopt the girls. As such, the children's best interests are served by terminating S.F.'s and R.T.'s parental rights and freeing the children up for adoption. We affirm.

**AFFIRMED.**