IN THE COURT OF APPEALS OF IOWA
No. 14-0599
Filed August 13, 2014

**IN THE INTEREST OF J.D. AND E.D.,**
**Minor Children,**

**Z.D., Father,**
**Appellant.**

_____

Appeal from the Iowa District Court for Cerro Gordo County, Annette L. Boehlje, District Associate Judge.

The father appeals the termination of his parental rights to his children, J.D. and E.D. **AFFIRMED.**

Dylan J. Thomas, Mason City, for appellant father.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, Carlyle D. Dalen, County Attorney, and Nichole Benes, Assistant County Attorney, for appellee State.

Nicole Olson of Heiny, McManigal, Duffy, Stambaugh & Anderson, P.L.C., Mason City, for appellee mother.

Mark Young and Crystal L. Ely of Young Law Office, Mason City, attorneys and guardians ad litem for minor children.

Considered by Danilson, C.J., and Vogel and Bower, JJ.

**PER CURIAM**

The father appeals the termination of his parental rights to his children, J.D. and E.D. He asserts that, because the State did not petition that his rights should be terminated under Iowa Code section 232.116(1)(h) (2013), the juvenile court improperly found termination warranted on that paragraph. He further argues that the requirements for termination were not met, because the children were never removed from his care, and they could have been returned to his care at the time of the termination hearing. He also argues termination was not in the children's best interest and that the bond between him and the children should have precluded termination. We conclude the juvenile court properly terminated the father's parental rights under the county attorney's petition cited paragraph (f) and that the citation to paragraph (h) in the disposition was merely a scrivener's error. Furthermore, due to the father's consistent violent behavior toward the mother and complete unwillingness to engage in services to correct his behavior, termination is in the children's best interest, and none of the considerations under Iowa Code section 232.116(3) preclude termination. Consequently, we affirm.

**I. Factual and Procedural Background**

J.D., born June 2003, and E.D., born August 2005, first came to the attention of the Department of Human Services (DHS) in December 2011. In the DHS report, it was noted the mother was using bath salts and abusing prescription drugs, the father had severely beaten the mother on several different occasions, and he had also hit J.D. over the head with a toy plastic gun. Specifically, the report stated:

Throughout the assessment it was reported that [the father] would physically hit [the mother] and lock her out of the house. [The mother] reported that he tied her hands behind her back, and [the father] would force her to make self-deprecating statements like she is a junkie or a whore, and then record those statements. [The mother] shared that she had suffered from physical abuse in the past from [the father]. For example, [the father] broke her nose while they were living in South Carolina. She reported that she was a victim of recent domestic violence as [the father] had beaten her up badly on or around November 24, 2011. [The mother] was taken to the ER in Mason City after [the father] hit her in the head leaving bumps, dragged her across the room and threw her down the stairs, as well as [the father] reportedly stepping on her neck and kicking her. [The mother] reported that [the father] had used zip-ties to tie her hands together to restrain her. While she was in the ER on 11-24-11 it was noted that [the mother] had several bruises in various stages of development. [The mother] and her grandmother reported that these bruises were due to the domestic violence that was inflicted upon her by [the father].

The allegations of abuse regarding the November 2011 beating were supported by photographs, which were entered into evidence at the termination hearing.

The mother and father separated in 2011.[1] While the original DHS investigation was focused on the mother and her substance abuse issues, once the physical abuse was discovered, the investigation focused on the father. The children were residing with the mother until a civil order of protection was dismissed, at which point the father picked the children up at school, citing concerns the mother was not able to parent them adequtely. He then took the children home with him.

The children were adjudicated in need of assistance on February 23, 2012, following a hearing, in which the juvenile court found it was not in their best

---

[1] The mother and father were married in 2003, separated in 2009, then reconciled for a brief period of time in 2011. Following their separation in 2011, a dissolution decree was entered on May 29, 2013. The decree ordered joint legal custody with the mother as the primary caretaker. The mother cooperated with all DHS services and the children remain in her care.

interest to remain with the father. In its recitation of facts, the court noted the mother was no longer abusing substances, and was otherwise complying with DHS services. The father, on the other hand, was an abuser who took no responsibility for his actions. The children were removed from the father's care on February 27.

Services were offered to the father, including: family safety, risk, and permanency services; psychological evaluations; mental health counseling; drug testing; substance abuse evaluations and treatment; supervised visitation; transportation; crisis intervention (domestic violence) services; family team meetings; CASA; and coordination with the Department of Corrections.

The father was granted supervised visitation. While the children clearly shared a bond with the father, service providers and psychologists were concerned this bond was not healthy. For example, the father told the children that the mother, DHS, and other case workers were sinners who would suffer the consequences when it came time for judgment, and would implicitly encourage the children to defy the mother, despite the service providers informing him this behavior was inappropriate. The father also recorded all visitation sessions. Following a visit on July 8, 2013, E.D. requested that visitations with the father cease. Both children demonstrated negative behavior following visits with the father. While told he could and should contact the children's therapist, the father never did so. As the juvenile court noted throughout the dispositional and review hearings and in the termination order, the father made no progress and showed no improvement with regard to these issues over the course of two years. Due to this inability to engage with the children in an appropriate manner, and the

detrimental effects the visits were having on the children, visitation was terminated in November 2013.

Throughout the course of proceedings, the father was resistant to intervention and suggestions. He consistently denied any abuse occurred between him and the mother and otherwise refused to take any responsibility for his actions, choosing to blame others. Whenever service providers would attempt to address his issues, he would refuse to talk about them, denying he had any problems, and instead focusing on the mother and her perceived faults as a parent and as a person. The service providers noted he obsessed over her. Even on appeal, he continues to assert the multiple injuries the mother suffered were self-inflicted. While he avoided a number of drug tests for inexplicable reasons, he tested positive for marijuana in June 2012.

A psychological evaluation of the father, dated June 2012, stated:

> Persons with test results like [the father] may harbor a good deal of hostility as well as rebellious impulses. They may typically control their anger only to have sudden and dramatic temper out bursts. [The father's] MMPI-2 profile suggests that he does not take responsibility for his problems in living and that he is instead prone to rationalizing and justifying his actions. According to the test results, he also is one to engage in displacement of blame. He may sometimes engage in guilty self-reproach that evolves into self-pity. At present, he seems to be feeling particularly mistreated and victimized.
> . . . .
> He also appears to be an angry person who may have periodic and dramatic temper outbursts that punctuate longer periods of control. There would seem to be a narcissistic quality to his personality with associated inability to assume responsibility for his problems.

The father submitted as an exhibit a letter from his psychologist, who met with him ten times between January and July 2013, though by the time the

termination hearing occurred, there had been approximately thirty visits.  The letter stated:

> In these 10 sessions, we further reviewed the concerns raised by Dr. Harper in his evaluation of June 2012, which I continue to consider to be more extrapolation from records of accusation against [the father] rather than based on assessment with relevant and valid psychological instruments . . . .  We have continued to work on perspective and emotional regulation around what he has felt is a very biased and distorted portrayal of him and his concerns that the welfare of his children is not being prioritized in the way that his ex-wife is being supervised . . . .  [W]e have also been working on a course of anger management . . . .  He has been open and responsive to this material despite his contention that he has never had issues with his temper other than during the brief time when he found himself hurt and betrayed by his wife's infidelity five years ago, which is the one occasion when he admits that he hit her.  In summary, [the father] continues to comply with the requirement to be in therapy and to address issues pertaining to the proper perspective in raising children and in how to best manage difficult emotions including anger.

However, during the termination hearing, the same psychologist testified that "in terms of needing to improve in the way that he has managed his frustration and aggravations, he would maintain that he didn't feel that there was that much to improve upon."

The father has a nursing background and was employed in the Army National Guard for thirteen years.  As of January 3, 2014, the father's employment situation was unknown.  He claimed he was employed but refused to supply DHS or the court with any of his employment information.  At the time of the hearing he was living with relatives.

The father also has a criminal history.  He was convicted of operating while intoxicated and assault causing bodily injury on January 24, 2014.  His victim in this case was a man who had dated the mother after her and the

father's separation, with the assault taking place on September 22, 2013, and resulting in the victim's broken clavicle. He was also convicted of two counts of domestic assault causing bodily injury—due to the 2011 beating of the mother—on September 16, 2013. However, at the termination hearing, he refuted responsibility for these actions, claiming he acted in self-defense and the mother in fact caused him to assault her. He was also jailed for thirty days for failing to comply with his pretrial release requirements, from April 9 to May 10, 2013.

Due to the father's unwillingness to engage in services and his complete lack of progress over the course of two years, the State filed a petition to terminate his parental rights. A contested hearing was held on January 24, 27, 28, and 31, 2014, in which service providers, psychologists, character witnesses, the mother, and the father testified. The juvenile court terminated the father's parental rights on March 31, 2014. The father appeals.

**II. Standard of Review**

We review termination proceedings de novo. *In re S.R.*, 600 N.W.2d 63, 64 (Iowa Ct. App. 1999). The grounds for termination must be proved by clear and convincing evidence. *Id.* Our primary concern is the children's best interest. *Id.*

**III. Merits**

As an initial matter, the adjudicatory section in the juvenile court's order, which cited Iowa Code section 232.116(1)(h),[2] was clearly a scrivener's error.

---

[2] To terminate under Iowa Code section 232.116(1)(h), the State must prove by clear and convincing evidence the child is three years of age or younger, adjudicated CINA, removed from home for six of the last twelve months, and the child cannot be returned home.

The county attorney's petition alleged section 232.116(1)(f), and the termination order set forth the factors to be proved under paragraph (f). The court then went through the proper analysis for termination under paragraph (f) throughout the decision. A typographical error is not grounds for reversal. *See State v. Yarborough*, 536 N.W.2d 493, 497 (Iowa Ct. App. 1995). Consequently, the argument that the termination should be reversed because the State did not prove grounds to terminate under paragraph (h) is without merit.

To terminate parental rights under Iowa Code section 232.116(1)(f), the State must show the child is four years or older, adjudicated CINA, has been removed from the parent's care for the last twelve consecutive months, and cannot be returned to the parent's care. The father's unsupported statement the children were never removed from his care is unsupported in the record. The children were clearly removed from his care on February 27, 2012, and never returned. He was only allowed to see the children during supervised visits, and he never progressed to unsupervised visits. Consequently, the requirement in paragraph (f) that the children be removed from his care for twelve consecutive months has been met.

We also agree with the juvenile court the State proved by clear and convincing evidence the children cannot be returned to the father's care, and more time would not correct the situation. The father has shown no progress or willingness to engage in services throughout the pendency of this proceeding. He consistently denies any abuse ever occurred, which evidences an unwillingness to modify his violent behavior. The fact he abused the mother in front of the children and yet never acknowledged that any harm occurred to

either the mother or the children, shows how dangerous it would be to return the children to his care. As the DHS worker testified:

> Domestic violence in homes where children may not directly see the physical hitting but hear or can sense intimidation or maybe hear stuff from a different room, still has a very negative impact on their emotional well-being, how they do in school, can impact their brain development at an early age, can impact their relationships as they get older, there's a whole bunch of stuff that goes into it. When kids are in a room when there's domestic violence, there's research that says their heart rate increases, their stomachs hurt, it's just negatively affecting their whole well-being. So domestic violence when kids are present or even in the vicinity of it, has a very negative impact on their overall development.

We also agree that termination is in the children's best interest pursuant to Iowa Code section 232.116(2). The father's testimony at the termination hearing and behavior in the past two years shows his inability to parent the children adequately and safely. He adamantly contends there was no abuse. However, it is vital the parent acknowledge and recognize abuse occurred before any meaningful change can take place. *See In re L.B.*, 530 N.W.2d 465, 468 (Iowa Ct. App. 1995). As stated previously, he has refused all attempts to help him correct his behavior. And as the children's guardian ad litem noted in the report to the court:

> Had [the father] made a conscious decision at any point over the past year to comply, even minimally, with the court orders, I do not believe that we would be at this point. The fact that [the father], knowing that his future with his children is hanging in the balance, has still failed to comply with the orders and to challenge the validity of nearly each and every facet of this case, is truly sad and I believe, is clear and convincing evidence that no amount of time and effort on the part of the Department or the Court will result in compliance. As such, it does not appear that any amount of time or effort will improve [the father's] ability to resume positive and healthy interaction with his children.

In determining the future actions of the parent, his past conduct is instructive. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). In this case, the father has not modified his behavior at all, and it is clear he has no intention of ever doing so. "[W]hen a parent is incapable of changing to allow the child to return home, termination is necessary." *In re T.T.*, 541 N.W.2d 552, 557 (Iowa Ct. App. 1995). Furthermore, the unequivocal opinion of each DHS worker, as well as the children's therapist, that the children cannot be returned to the father's care and termination is in their best interest, shows that reunification cannot be achieved.

Additionally, none of the considerations in Iowa Code section 232.116(3) should preclude termination of the father's parental rights. While the children share a bond with the father, as a DHS worker testified, "I don't believe it's been an overly healthy relationship . . . and regardless of the type of abuse that children experience at the hands of a parent or a caregiver, very frequently there is a bond there."

The relative-placement consideration should not apply either, given the father's violent abuse of the mother. Having this apply would only serve to put the mother and children in danger. *See In re C.K.*, 558 N.W.2d 170, 174 (Iowa 1997) ("An appropriate determination to terminate a parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child."). Moreover, while J.D. expressed some hesitation about the father's parental rights being terminated, as the juvenile court noted, this opinion by no means was unequivocal. Most importantly, however, each expert opinion counseled against allowing the father to resume care of the children. Consequently, the considerations listed in Iowa Code section 232.116(3) do not

preclude termination of the father's parental rights, and we affirm the juvenile court's order.

**AFFIRMED.**