# IN THE COURT OF APPEALS OF IOWA

No. 22-0689
Filed November 2, 2022

IN THE INTEREST OF R.V., C.V., T.V., and J.V.,
Minor Children,

S.V., Mother,
        Petitioner-Appellant,

J.V., Father,
        Respondent-Appellee.

DEAN A. FANKHAUSER, Guardian ad Litem,
        Appellant.

_____

Appeal from the Iowa District Court for Sioux County, Daniel P. Vakulskas,

District Associate Judge.


A mother and her children's guardian ad litem appeal the denial of the

mother's petition to terminate the father's parental rights to their four children.

**REVERSED AND REMANDED WITH DIRECTIONS.**

Rosalynd J. Koob of Heidman Law Firm, P.L.L.C., Sioux City, for appellant

mother.

Dean A. Fankhauser of Vriezelaar, Tigges, Edgington, Bottaro, Boden &

Lessmann, L.L.P., Sioux City, attorney and guardian ad litem for minor children.

Jenny L. Winterfeld of Klass Law Firm, L.L.P., Sioux Center, for appellee

father.


Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

A mother of four children petitioned to terminate the parental rights of the children's father under Iowa Code section 600A.8(3)(b), (9), and (10) (2021) after he was convicted of sexual offenses against the mother's two minor sisters. The juvenile court determined those grounds had been met, yet found termination was not in the children's best interests because the mother raised only "a litany of 'what ifs.'" The mother and the children's guardian ad litem appeal.

## I.    Background Facts and Proceedings

This family is from a small farming community in northwest Iowa. The mother is one of eleven children. Her parents operate a large dairy farm and feedlot. The father began a relationship with the mother when she was only fourteen years old and he was eighteen. The father married the mother once she turned eighteen, and they had four children together, born in 2012, 2014, 2015, and 2017. The couple lived on a farm near both of their families where they raised heifers and custom fed pigs. The father also worked for the mother's parents on their farm, sometimes spending the night if there was bad weather or chores that needed to be done.

In March 2018, the father was charged with two counts of second-degree sexual abuse, three counts of third-degree sexual abuse, and lascivious conduct with a minor. His victims were two of the mother's minor sisters, who still lived at home with their parents at the farm where the father worked. The trial information alleged that the father began sexually abusing one of the sisters when she was under the age of twelve. The father ultimately agreed to plead guilty to third-degree sexual abuse, a class "C" felony, under Iowa Code section 709.4(1)(b)(2) (2015)

and an amended charge of indecent exposure, a serious misdemeanor, under section 709.9 (2011).[1] He was sentenced in July 2018 to an indeterminate term not to exceed ten years in prison for the sexual abuse conviction.[2] The father was also sentenced to a lifetime special sentence of parole under Iowa Code section 903B.1 and ordered to register as a sex offender for life upon his release from custody. His tentative discharge date from prison is February 2023.

At first, the mother was supportive of the father, expressing a desire to stay married to him and keep their family together. She allowed the father to live with her and the children while he was out on bond pending trial. Once the father went to prison, he was barred from having any contact with the children because of the nature of his sex offenses. But he talked to the mother every day on the phone, and she visited him in prison. The mother also wrote the father letters, telling him how much she and the children missed him. And she stayed in contact with his family and had weekly dinners with his parents. For a time, the prison allowed the

---

[1] As to the crimes the father pled guilty to, section 709.4(1)(b)(2) (2015) stated that a "person commits sexual abuse in the third degree when the person performs a sex act under any of the following circumstances. . . . [t]he act is between persons who are not cohabiting as husband and wife" and "[t]he other person is twelve or thirteen years of age." Section 709.9 (2011) stated that a "person who exposes the person's genitals or pubes to another not the person's spouse . . . commits a serious misdemeanor if" the person "does so to arouse or satisfy the sexual desires of either party" and the person "knows or reasonably should know that the act is offensive to the viewer." Although the trial information, plea agreement, and judgment were admitted as exhibits at trial, the factual basis for the father's guilty pleas is not in the record before us. Nor are the minutes of evidence that accompanied the trial information.

[2] For the indecent exposure conviction, the father was sentenced to 365 days in jail with all but thirty days suspended, to run concurrently with his prison sentence for the sexual abuse offense.

father to communicate with the children in writing who, at the mother's urging, sent him some letters, cards, and drawings.

That limited contact with the children stopped in September 2020 because the father started sex offender treatment, a condition of which prohibited him from having contact with minors. The father told the mother that another condition of the program required him to make a full disclosure to her of his sexual offenses. The father made this disclosure during one of his phone calls with the mother in October or December. According to notes the mother took, the father's victims included male and female children ranging in age from five to fourteen years old.[3] The acts that he performed on these children encompassed everything from hugging, kissing, and unspecified "grooming" type behavior, to fondling, "exposure," digital and oral penetration, and "forced masturbation." The father also disclosed that he had engaged in voyeurism, along with masturbating and watching porn "a lot." Finally, the father revealed that he had sexual contact with dogs, cats, goats, pigs, and a cow.

A few months after learning this information, and faced with the reality of the father being released from prison, the mother decided to cut off contact with him. She explained:

> I am a 14-year-old victim of [the father's] also, I have been groomed since the age of 14, and I never knew anything different, so yes, now I've finally come out of my shell, I'm my own person, and I refuse to let my kids back in his hands.

---

[3] The father also listed some same-age and adult sexual partners. It is unclear from the mother's notes whether these were consensual sexual encounters or not.

The mother filed for divorce in March 2021, followed by the petition to terminate the father's parental rights under Iowa Code section 600A.8(3)(b), (9), and (10) (2021) in July.

The father completed the sex offender treatment program around the same time the mother filed for divorce. He requested early parole in August, which was denied the next month due to the seriousness of the father's crime. In October, the father falsely believed he had permission to contact his children, so he called the house phone multiple times. The oldest child answered one of those times and hung up when she realized it was her father. None of the children have seen the father in person since he went to prison in July 2018. According to the mother, the youngest child has no memory of the father and the others haven't asked about him in years.

Other than that phone call which, according to one of the children's therapists "shocked" the oldest child, the children are thriving in the mother's care. The therapist described them as "clean, polite . . . honest, they have just delightful sense[s] of humor. They're truly wonderful kids, very well-adjusted." The therapist worried that if the father was reintroduced into the children's lives, "that would be a big upheaval, which could potentially come with a variety of mental health concerns," like stress, anxiety, and difficulty sleeping. Without the father in their lives, the mother has been able to expand the couple's business, adding more heifers to raise and pigs to custom feed. She also started a pig vaccination business, mostly for pigs owned by one of her brothers. The mother has received no financial assistance from the father since his incarceration. Instead, when she was still in contact with him, the mother was sending him money.

In its ruling denying the mother's petition after the termination hearing ended in February 2022, the juvenile court gave her credit for the "admirable job of raising the children as a single parent." But the court was concerned that she needed help from "her family, the State, and her church" to do so.[4] Though there was little evidence of the mother's financial situation, the court found the "children would clearly benefit from another gainfully-employed parent." In doing so, the court dismissed the therapist's concerns about the harm the father's reappearance could cause them, finding "therapeutic intervention is available for situations just like this." The court also dismissed the mother's concerns that the father "may perpetrate a sex act upon the children" because safeguards "could be put into place . . . to prevent such an incident." In the end, the court found that while the father "should be ashamed of himself for having put his family in an unenviable place based on his actions," termination of his parental rights was not in the children's best interests.

## II.     Standard of Review

Petitions to terminate parental rights under Iowa Code chapter 600A are reviewed de novo. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). "Although we are not bound by them, we give weight to the trial court's findings of fact, especially when considering credibility of witnesses." *Id.* (quoting *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998)).

---

[4] The only assistance the children were receiving from the State at the time of the trial was Medicaid. But, as the mother pointed out, the children were on Medicaid before the father went to prison.

**III.     Analysis**

Terminations under Iowa Code chapter 600A require a two-step analysis. *In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018).  The mother must prove by clear and convincing evidence that (1) grounds for termination exist under section 600A.8 and (2) termination is in the children's best interests.  *B.H.A.*, 938 N.W.2d at 232.

On the first step, the juvenile court found the mother met her burden as to all of the grounds alleged in her petition—section 600A.8(3)(b) (abandonment), 600A.8(9) (the parent has been imprisoned and it is unlikely that the parent will be released for a period of five or more years), and 600A.8(10) (convicted of a sex offense against a minor, never married to the minor's other parent, and serving a minimum sentence of confinement of at least five years for that offense).  But the court found she failed on the second step of the analysis— whether termination is in the children's best interests.  *Id.*  So that's where our analysis starts.

**A.     Best Interests**

The best interests of the children is "'the *paramount consideration* in interpreting' the private termination of parental rights," though the "parent's interest must also be given due consideration."  *Id.* (quoting Iowa Code § 600A.1).  The best-interests standard under section 600A.1(2) requires

> that each biological parent affirmatively assume the duties encompassed by the role of being a parent.  In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, *but is not limited to consideration of*, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the

child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

(Emphasis added.) Our supreme court has also determined that we can borrow "from the statutory best-interest framework outlined in Iowa Code chapter 232," which directs us to "give primary consideration to the child's safety" and "to the best placement for furthering the long-term nurturing and growth of the child." *B.H.A.*, 938 N.W.2d at 232 (quoting Iowa Code § 232.116(2)). Also of importance "is the child's emotional and psychological health" and the closeness of the parent-child bond. *Id.* (citing Iowa Code § 232.116(2), (3)).

In its best-interests analysis, the juvenile court first determined that "[d]espite his multiple sex acts and crimes, the evidence showed [the father] was an active parent prior to his incarceration," noting he was "employed, helped support the family, and helped raise the children." But these children were young when the father went to prison—the oldest was six years old and the youngest was one. At the time of the termination hearing, he had not seen them in person or provided any support for them for close to four years. The youngest child does not remember the father, and the oldest three, according to their therapist, are "very unattached [to him], to the point of family-type questions or activities do not include him." With this lack of bond, *see id.*, we do not find the father's involvement in the children's lives before his incarceration to carry much weight. Further, while the father was being "an active parent," he was also being an active sexual abuser.

The father admitted to the mother that he started sexually abusing her little sister when she was only seven years old.[5] Over a seven-year period, on at least one hundred occasions, that abuse included "forced masturbation," oral sex, digital penetration, fondling, and "exposure"—basically "everything but actual penis penetration." His abuse of the mother's other sister started when she was fourteen years old and encompassed much of the same. The father's sexual abuse was not limited to the mother's family—he admitted to sexually abusing his own cousins and children that he babysat when he was younger.

No matter how involved the father was in the children's lives before his sexual abuse surfaced, we cannot discount his past acts as the juvenile court seemed to do in dismissing the mother's concern that the father "may perpetrate a sex act upon the children." The court reasoned: "That is certainly a justifiable concern for any parent; however, that generalized fear with no objective basis is not enough to terminate one's parental rights. It is simply too far attenuated from his actual acts to convince this [c]ourt that [it] is an urgent concern at this time."

Given the father's decades-long sexually deviant behavior, which crossed gender, age, and animal boundaries, we do not agree the mother's "fear" was generalized or without an "objective basis," particularly considering the children are now the same age as many of the father's victims. *See id.* at 233 (noting insight for a child's future in a parent's care "can be gained from evidence of the

---

[5] When the father was asked at trial about the abuse the mother had documented during his disclosure to her, he invoked his Fifth Amendment privilege. Because this is a civil case, we are able to draw adverse inferences from his refusal to answer those questions. *See State v. Heard*, 934 N.W.2d 433, 440 n.4 (Iowa 2019).

parent's past performance" (citation omitted)).  Though "'caselaw has limited utility' when considering the best-interest-of-the-child framework," *id.*, there are many cases from this court holding that it is not in a child's best interest to be in proximity to a sex offender.  *See, e.g.*, *In re A.K.*, No. 19-0406, 2019 WL 5424964, at *1–2 (Iowa Ct. App. Oct. 23, 2019) (terminating rights of father who sexually abused another child in the household); *In re O.H.*, No. 18-0136, 2018 WL 3060273, at *1–3 (Iowa Ct. App. June 20, 2018) (terminating rights of father who was currently incarcerated for sexually abusing another child in the home); *In re D.G.*, No. 03-2010, 2004 WL 240320, at *1 (Iowa Ct. App. Feb. 11, 2004) (terminating father's rights because he sexually abused his child's half-sister and physically abused the child's half-brother); *In re B.M.,* No. 02-0873, 2002 WL 31314870, at *4 (Iowa Ct. App. Oct. 16, 2002) (finding a child could not be returned to his father because the father's half-brother molested the child).

The juvenile court found the mother's arguments on the best-interests question revolved "around a litany of 'what ifs.'"  However, "[t]he best-interest-of-the-child framework has backward-looking and forward-looking components." *B.H.A.*, 938 N.W.2d at 222.  And courts "must act to prevent probable harm to the child and need not delay until actual physical harm has occurred."  *In re T.C.*, 522 N.W.2d 106, 108 (Iowa Ct. App. 1994); *accord In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially) (stating the children's safety is paramount).  When we look backward in this case, we do not see a "litany of what ifs."  Instead, we see a litany of sexual assaults and victims.

Looking forward, we do not put as much stock into the father's completion of sex offender treatment as the juvenile court seemed to, considering that he has

not shown an ability to not reoffend outside a prison setting. *See B.H.A.*, 938 N.W.2d at 236 ("Rather than speculate about what the future holds for Dad while at a secure facility where he is under the constant watchful eye of armed correctional officers and video surveillance, it is more accurate to look in the rear-view mirror and make a decision for [the child] based on what has already happened in his life."). As one of the children's therapists testified, even with treatment, "[t]here's quite a high recidivism rate" for offenders like the father whose victims include "children, both male and female, adults, and animals."

The juvenile court also pointed to unspecified "safeguards" that could be put into place to ensure the father's contact with the children was appropriate. *Cf. Q.G.*, 911 N.W.2d at 773 (discussing safeguards the parents agreed to in their dissolution decree for contact between the father and children). And the father relies on the support system he will have in place once released from prison "to support his reentry into society and to help avoid relapse." But that support system, consisting of the father's family, does not know the extent of his sexual offenses. As to the offenses the family did know about—those involving the mother's minor sisters—they did not hold the father fully responsible. The mother testified that the father's parents told her they blamed her sisters and believed the sex acts were consensual. The paternal grandfather confirmed that, testifying as to one of the sisters that "she has to bear some responsibility." With this support system, we are doubtful that the children's safety would be ensured.

Much of the juvenile court's focus was on the loss of potential financial support from the father, with the court finding:

> There is no step-parent in the waiting to adopt these children in the event of a termination. [The father] is employable (upon release from prison) and would be able to help support the children at that time. Cutting off that support is not in the children's best interests. While [the mother] has done an admirable job of raising the children as a single parent, she has also had to utilize her family, the State, and her church for assistance. The children would clearly benefit from another gainfully-employed parent.

Our de novo review of the record shows the mother has been doing well without the father's financial support. The court correctly noted her family has helped her, but that was true before the father's incarceration, and the assistance the mother received from the family's church was during the time when she was visiting the father and sending him money. The mother is industrious and hard-working, having expanded the business she started with the father since his incarceration. There is no evidence these children will become a "charge upon the State." *In re D.S.*, No. 16-1573, 2017 WL 1733252, at *3 (Iowa Ct. App. May 3, 2017) (reaching the same finding where the only public support the mother received for the child was Title XIX health insurance).

Like in *B.H.A.*, aside from the juvenile court's hope that the father may develop a "healthy and meaningful relationship with his children upon his release," "the record is virtually devoid of any meaningful evidence that terminating [the father's] parental rights would be detrimental to [the children] due to any alleged closeness of relationship." 938 N.W.2d at 234. Indeed, the record showed the opposite. *Id.* Both of the therapists who have treated the children testified that introducing the father back into the children's lives would harm them. The juvenile court discounted their testimony because "therapeutic intervention is available for situations just like this." But these therapists were experienced in reintegration

therapy. Simply put, we find "the risk of sexual abuse," along with the number of years the father has been absent from the children's lives, outweighs any "detrimental effect" of terminating his parental rights. *In re A.K.S.*, No. 09–1204, 2010 WL 668758, at *4 (Iowa Ct. App. Feb. 26, 2010).

### B. Appellate Attorney Fees

Though the mother's financial situation was part of why the father argued termination of his parental rights was not in the children's best interests, he wants the mother to pay his appellate attorney fees. The father cites only dissolution of marriage and custody cases in support of this request. He provides us with no authority for the award of appellate attorney fees for private counsel under Iowa Code chapter 600A, most likely because that authority is lacking.

Section 600A.6B(1) "governs the payment of attorney fees in a private termination action, but it only applies to appointed counsel and does not mention private counsel." *In re E.E.*, No. 21-0034, 2021 WL 3907807, at *6 (Iowa Ct. App. Sept. 1, 2021). The father's attorney was privately retained. So we deny his request for appellate attorney fees.

## IV. Conclusion

Because we find termination of the father's parental rights is in these children's best interests, we reverse the juvenile court's denial of the mother's termination petition and remand for entry of an order consistent with this opinion. *See B.H.A.*, 938 N.W.2d at 236 (concluding "chapter 600A's best-interest factors weigh in favor of terminating Dad's parental rights" and "revers[ing] the judgment of the juvenile court and remand[ing] for entry of an order consistent with this

opinion"); *In re J.B.*, No. 21-1420, 2022 WL 9510153, at *8 (Iowa Ct. App. Mar. 30, 2022).  The father's request for appellate attorney fees is denied.

**REVERSED AND REMANDED WITH DIRECTIONS.**